E. Joel Peterson & others[1] vs. Commissioner of Revenue.

Suffolk. March 7, 2005. - April 26, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Taxation*, Income tax, Capital gain, Classification amendment. *Constitutional Law*, Taxation.

This court concluded that St. 2004, c. 149, § 413, which directed the Commissioner of Revenue not to adjust the tax liability stemming from capital gains realized between January 1, 2002, and April 30, 2002, for any taxpayer who had already paid capital gains taxes at prior rates, did not qualify as a reasonable exemption under art. 44 of the Amendments to the Massachusetts Constitution, which commands that income taxes be levied at a uniform rate with respect to the same class of property, where the exemption was not limited in scope and the purpose of the exemption created a sizeable imbalance in the income tax burdens borne by taxpayers without regard to ability to pay [132-137]; further, this court concluded that the unconstitutional exemption in § 413 was severable from the effective date (January 1, 2002) established in St. 2004, c. 149, § 414, for a new capital gains tax rate [137-141].

Civil action commenced in the Supreme Judicial Court on March 25, 2003.

The case was reported by *Sosman, J.*

*Stephen Schultz (Stephen M. Politi* with him) for the taxpayers.

*Thomas A. Barnico*, Assistant Attorney General (*Amy Spector*, Assistant Attorney General, with him) for Commissioner of Revenue.

*Carl Valvo*, for J. James Marzilli, Jr., amicus curiae, submitted a brief.

Sosman, J. In *Peterson* v. *Commissioner of Revenue*, 441 Mass. 420, 429 (2004) (*Peterson I*), this court held that the use of May 1, 2002, as the effective date for a change in the capital gains tax rate, as set forth in the Revenue Enhancement Act of

[1]Eighty-nine other taxpayers of the Commonwealth.

2002 (Act), St. 2002, c. 186, § 32, violated the uniformity requirement of art. 44 of the Amendments to the Massachusetts Constitution. In the wake of that decision, the Legislature enacted St. 2004, c. 149, §§ 413 and 414, which provide that the effective date of the new capital gains tax rate is January 1, 2002, but simultaneously direct that the Commissioner of Revenue (commissioner) not adjust the tax liability stemming from capital gains realized between January 1, 2002, and April 30, 2002, for any taxpayer who already paid capital gains taxes at the prior rates. In an amended complaint, the plaintiffs in *Peterson I* allege that these new provisions concerning the effective date and nonenforcement of the new capital gains rate for transactions occurring prior to May 1, 2002, (1) violate the uniformity requirement of art. 44; (2) deprive them of due process in violation of the Fourteenth Amendment to the United States Constitution; and (3) deny them equal protection of the laws, in violation of the Fourteenth Amendment and art. 10 of the Declaration of Rights of the Massachusetts Constitution. With respect to a remedy for these alleged constitutional violations, the plaintiffs argue that §§ 413 and 414 are integrated to the extent that both sections must be invalidated, resulting in an effective date of January 1, 2003. The commissioner contends that § 413 constitutes a "reasonable exemption[]" permitted by art. 44, that it does not deny the plaintiffs due process or equal protection, and that, even if § 413 must be struck as unconstitutional, it should be severed, leaving intact the January 1, 2002, effective date set forth in § 414.

The single justice reserved and reported the matter to the full court without decision. The parties agreed that the issues raised in the plaintiffs' amended complaint could be resolved by answering the following reported questions:

"1. Whether Section 413 of Chapter 149 of the Acts of 2004, when read together with Section 414 of the same Chapter, violates either Article 44 of the Amendments to the Constitution of the Commonwealth, the due process clause of the United States Constitution, the equal protection clause of the United States Constitution or Article 10 of the Declaration of Rights of the Massachusetts Constitution?

"2. If Section 413 is held to violate one or more of the provisions of the [S]tate or [F]ederal [C]onstitutions cited in Question 1, above, is it separable from Section 414 of Chapter 149 of the Acts of 2004?

"3. If Section 413 is held to violate one or more of the provisions of the [S]tate or [F]ederal [C]onstitutions cited in Question 1, above, and is held not to be separable from Section 414, whether January 1, 2002, or January 1, 2003, is the effective date for changes in the capital gains tax laws effected by the Revenue Enhancement Act of 2002?"

For the following reasons, we conclude that the § 413 directive that the commissioner not enforce the new capital gains tax rate for capital gains incurred prior to May 1, 2002, does not qualify as a "reasonable exemption[]" under art. 44, and that it therefore violates the uniformity requirement of art. 44 as construed in *Peterson I.* We also conclude that § 413 can be severed from § 414, thereby retaining the January 1, 2002, effective date provided by § 414.[2]

1. *Background.* The plaintiffs are taxpayers who realized capital gains between May 1, 2002, and December 31, 2002. Section 14 of the Act provides that all income from capital gains is to be taxed at the same 5.3 per cent rate as ordinary income (see G. L. c. 62, § 4 [*b*], as amended through St. 2002, c. 186, § 13), thereby eliminating the six classes of capital gains and corresponding tax rates (from no tax up to a tax of five per cent) based on the length of time the asset had been held prior to sale. See G. L. c. 62, § 2 (*b*) (3), as amended through St. 1994, c. 195, § 10; G. L. c. 62, § 4, as amended through St. 1994, c. 195, § 20. This change in the capital gains tax rate was made effective May 1, 2002. St. 2002, c. 186, § 32. As a result, the plaintiffs incurred capital gains tax liability for their post-May 1, 2002, transactions, whereas, under prior law, the plaintiffs' transactions would have incurred either a capital gains tax at a lower rate or no capital gains tax liability at all.

---

[2]In light of our conclusion that § 413 violates art. 44 of the Amendments to the Massachusetts Constitution, we need not reach the plaintiffs' other constitutional claims. Also, where § 413 can be severed from § 414, we need not reach the third reported question.

In *Peterson I*, the plaintiffs contended that taxing capital gains for the 2002 tax year at different rates based on whether they were realized before or after May 1, 2002, violated the art. 44 requirement that taxes be "levied at a uniform rate throughout the [C]ommonwealth upon incomes derived from the same class of property." This court agreed. *Peterson I, supra* at 429. "[A] single tax rate must be applied to income from the same class of property received during the period specified by the Legislature for measuring income. That period in this case is calendar year 2002. Only one tax rate may be applied to all long-term capital gains realized in calendar year 2002. There cannot be, consistent with art. 44, more than one long-term capital gains tax rate on income for the taxable year 2002." *Id.* As a result, the May 1, 2002, effective date for the increased capital gains tax rate was held unconstitutional. *Id.*

The increased rate could, consistent with art. 44, be made effective as of January 1, 2003. *Id.* However, it was also possible that, by severing the unconstitutional May 1, 2002, date set forth in § 32 of the Act, the increased rate could be made effective as of January 1, 2002. *Id.*, citing G. L. c. 62, § 54. Because the record was not sufficiently developed on the issue, the matter was remanded to the single justice for further proceedings with respect to the determination of the effective date of the rate change. *Id.*

On remand, the plaintiffs took the position that January 1, 2003, was the appropriate effective date. However, within three weeks of the issuance of the rescript to the single justice, legislation was introduced to amend the Act and set a new effective date for the capital gains tax rate. See 2004 House Doc. No. 4601, §§ 127, 128. See also 2004 Senate Doc. No. 2401, §§ 311, 355; 2004 House Doc. No. 4850, §§ 413, 414; 2004 House Doc. No. 4744, §§ 62, 64. Over the plaintiffs' objection, the single justice postponed briefing and consideration of the effective date pending the outcome of these legislative efforts to resolve the issue.

On June 25, 2004, St. 2004, c. 149, was enacted, addressing inter alia the effective date of the new capital gains rate set forth in the Act. In § 414, the new rate was made effective "for tax years beginning on or after January 1, 2002." However,

§ 413 provided: "Notwithstanding any general or special law to the contrary the commissioner of revenue shall not adjust the tax liability with respect to capital gains for the period January 1, 2002 to April 30, 2002 for any taxpayer who, before the effective date of this act, paid that liability in full for capital gains realized between January 1, 2002 and April 30, 2002, inclusive." The effect of §§ 413 and 414, compared to the effect of § 32 of the Act that was previously held unconstitutional, is virtually identical. Whereas § 32 made May 1, 2002, the official effective date of the new tax rate, § 413 now directs the commissioner not to enforce or collect that new rate for any transactions occurring prior to May 1, 2002, as long as the taxpayer has already paid whatever capital gains taxes (if any) were owed under preexisting law.

The plaintiffs were allowed to amend their complaint to add a count seeking a declaratory judgment that §§ 413 and 414 were unconstitutional and that the commissioner could not enforce the Act's capital gains rate to their 2002 capital gains realized after May 1, 2002. The three questions dispositive of the plaintiffs' claims were then reserved and reported to the full court based on a stipulated record, which included the commissioner's estimates of the amount of capital gains taxes that would be owed, or the overpayments that would have to be refunded, depending on the court's answers to the reported questions. If § 413 were upheld, the year 2002 capital gains taxes that would not be enforced or collected in accordance with the directive of that section are on the order of $130 million to $160 million. The 2002 capital gains taxes collected at the new rate for transactions on or after May 1, 2002, that would need to be refunded if both § 413 and § 414 were struck and the effective date were January 1, 2003, are on the order of $225 million to $275 million.

2. *Discussion.* a. *Does § 413 create a reasonable exemption?* The commissioner contends that § 414 sets the effective date for the new tax rate and that § 413 creates a "one-time exemption" from that rate. While art. 44 commands that income taxes be levied "at a uniform rate" with respect to the same class of property, it permits the Legislature to "grant reasonable exemptions and abatements." The commissioner argues that the

exemption granted by § 413 is a "reasonable" one within the purview of art. 44. He seeks to justify that exemption by positing the theory that taxpayers realizing capital gains after May 1, 2002, were on "notice" that that gain "might" be taxed, whereas taxpayers realizing capital gains prior to that date would not have had any such "notice." The first bill proposing a change in the capital gains rate, 2002 House Doc. No. 5054, was introduced on May 2, 2002. That bill, as introduced, would have applied the new rate to all 2002 transactions resulting in capital gains. The commissioner argues that it was "reasonabl[e]" for the Legislature later to adopt a different scheme because it would be "unfair" to impose the new tax rate on persons who had completed their transactions before the legislation was introduced, whereas those who did so after the legislation was introduced had "notice that there might be an increase in the tax rate."[3]

The commissioner's theory that this particular exemption is justified by notions of notice and reliance is a strained one at best. Given that tax legislation may be applied retroactively (see, e.g., *United States* v. *Carlton,* 512 U.S. 26, 35 [1994]; *John S. Lane & Son* v. *Commissioner of Revenue,* 396 Mass. 137, 141-142 [1985]; *Keniston* v. *Assessors of Boston,* 380 Mass. 888, 905 [1980], and cases cited), taxpayers are always on "notice" that there "might" be changes in the tax laws that could affect transactions they are contemplating. The mere introduction of new tax legislation — which may or may not ever be enacted, and may or may not be given an effective date retroactive to some time prior to the bill's passage — does little if anything to provide taxpayers with "notice" of what the tax

[3]The commissioner has expressly — and appropriately — waived any claim that the "administrative costs of the Commonwealth and/or difficulties of administration by the Commonwealth in the assessment or collection of taxes" would justify the § 413 exemption. That administrative costs might have to be incurred to remedy a tax scheme that has been held unconstitutional does not permit the perpetuation of that unconstitutional scheme or justify the denial of a remedy. See *McKesson Corp.* v. *Division of Alcoholic Beverages & Tobacco, Dep't of Business Regulation of Fla.,* 496 U.S. 18, 49-51 (1990). Thus, an "exemption" cannot be justified by the fact that administrative costs and difficulties would be incurred in order to remedy the constitutional infirmity identified in *Peterson* v. *Commissioner of Revenue,* 441 Mass. 420, 429 (2004) (*Peterson I*).

consequences of any proposed but yet to be completed transaction will be.

More importantly, this exemption does not come within the bounds of what we have previously approved as "reasonable exemptions" under art. 44. "The 'reasonable exemptions' provision of art. 44 does not authorize special treatment that undercuts the dominant requirement of uniformity in art. 44." *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 242 (1981). "Not only must exemptions be reasonable, therefore, but also they must not conflict with the uniformity requirement." *Massachusetts Taxpayers Found., Inc.* v. *Secretary of Admin.*, 398 Mass. 40, 46 (1986). Although the "constitutional requirement of a uniform rate . . . cannot be absolute, because it is impossible to achieve a uniform effective rate of taxation where exemptions are allowed," *Opinions of the Justices*, 386 Mass. 1223, 1226 (1982), we require that there be a "balance between uniformity and reasonableness" of the exemption, *Massachusetts Taxpayers Found., Inc.* v. *Secretary of Admin., supra* at 47. We must therefore consider the reasonableness of the exemption's deviation from the overarching requirement of uniformity, not just the rationality of the justification for the exemption viewed in isolation, in determining whether an exemption qualifies as "reasonable" under art. 44.

We therefore begin our analysis by looking at the magnitude of the exemption itself: how large is it, and how much of a deviation from uniformity does it represent? To date, only those exemptions representing a minor deviation from uniformity have been approved. For example, in *Opinion of the Justices*, 426 Mass. 1206, 1208 (1998), the Justices advised that a deduction from dividend and interest income of no greater than $4,000 was not "so great as to foster any significant inequality in the relative burdens borne by taxpayers." Similar advice was rendered in *Opinion of the Justices*, 270 Mass. 593, 601 (1930), where the Justices opined that small personal exemptions for taxpayers of very limited means were "not so large as to bear on their face indications of want of equality." While such limited exemptions that will not cause the effective income tax rates to "vary greatly" are permissible under art. 44, the Justices would

not endorse income tax exemptions resulting in a "considerable departure from a uniform rate of effective taxation." *Opinions of the Justices*, 386 Mass. 1223, 1228 (1982).

The exemption before us today is not limited in scope — indeed, unlike the small-scale exemptions this court has previously approved under art. 44, it has no dollar limit at all. The capital gains tax rate that is ostensibly imposed effective January 1, 2002, is completely waived for any transaction occurring prior to May 1, 2002, without regard to the size of the transaction or the amount of the capital gains tax that would result, as long as the taxpayer had, prior to the June 25, 2004, passage of § 413, already paid his or her 2002 income taxes. This is not some small deduction that would, in the over-all calculation of income taxes, have only slight effect or cause only a minor deviation from perfect uniformity. Rather, it is a wholesale exemption from paying the entire tax increase. Of the total capital gains tax increases that were to be put into effect as of January 1, 2002, the commissioner's estimates indicate that the § 413 exemption would waive approximately thirty-seven per cent of those taxes. The commissioner points to no precedent supporting the reasonableness of an income tax exemption of that magnitude. Indeed, for the far smaller exemptions that the Justices have approved, they did so with the caveat that even those small exemptions came close to the outer limits of reasonableness under art. 44. See *Opinion of the Justices*, 426 Mass. 1206, 1208 (1998) ($4,000 deduction for elderly persons with low income "approaches, but does not exceed, the bounds of reasonableness under art. 44"); *Opinion of the Justices*, 270 Mass. 593, 598, 601 (1930) (deductions from business income ranging from $1,500 to $3,000 for persons of extremely limited means, "while approaching to the verge of reasonableness, cannot quite be said to exceed that bound"). The enormity of this particular deviation from the uniformity requirement of art. 44 places it beyond the limits of a "reasonable exemption[]."

In assessing the reasonableness of an exemption from income tax under art. 44, we also consider the purpose of the exemption. Exemptions premised on a taxpayer's inability to pay have passed muster. See *Opinion of the Justices*, 426 Mass. 1206, 1208 (1998) (elderly taxpayers living on less than $30,000 per

year "truly need the exemption" where Legislature found they "wholly 'lack the ability to pay' more taxes"); *Opinion of the Justices,* 270 Mass. 593, 599-600 (1930) (exemption permissible where taxpayers had no income above that needed for own support; Legislature has discretion to grant exemptions so that taxes may be "apportioned among all the people to the end that the burdens for the support of government may rest as nearly equally as possible among those able to bear them"). Exemptions may also be permissible where they operate, in their overall effect, to remedy inequality in tax treatment. See *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth,* 384 Mass. 209, 245 (1981) (deduction for taxpayers who rent homes permissible where it "tends to reduce the disparate treatment of the home owner and home renter in the operation of the income tax law"). By comparison, exemptions that are based only on relative ability to pay (as opposed to inability to pay) do not qualify as "reasonable" under art. 44. See *Massachusetts Taxpayers Found., Inc.* v. *Secretary of Admin.,* 398 Mass. 40, 46-47 (1986). There, despite the fact that a graduated income tax system could be viewed as "reasonable" in the abstract, a complex system of graduated exemptions based on levels of income was apparently intended to tax the same class of income at different rates rather than to impose the tax burdens "as nearly equally as possible among those able to bear them," and therefore violated art. 44. *Id.* at 45-46, quoting *Opinion of the Justices,* 386 Mass. 1223, 1229 (1982).

The exemption in the present case is not premised on any inability to pay, or on any attempt to rectify some other imbalance in the income tax laws. Instead, without regard to ability to pay, it creates a sizeable imbalance in the income tax burdens borne by taxpayers. As discussed above, the exemption is ostensibly premised on the tenuous assumption that taxpayers engaging in capital gains transactions after tax legislation was introduced on May· 2, 2002, had "notice" that would not have been available to taxpayers prior to the introduction of that legislation. Assuming (without deciding) that this "notice" theory could suffice to justify a small exemption with a finite and measurable impact on the effective income tax rate, it cannot justify an exemption of this unprecedented and unlimited magnitude.

Moreover, the plaintiffs contend — with considerable force — that this purported "exemption" was simply a ruse by which to achieve the exact same mid-year effective date that this court found unconstitutional in *Peterson I.* In light of *Peterson I,* § 413 does appear "intended to tax the same class of income at different rates," an intent that is antithetical to art. 44. *Massachusetts Taxpayers Found., Inc.* v. *Secretary of Admin., supra* at 45. Given its magnitude and apparent purpose, the exemption provided by § 413 does not qualify as a "reasonable exemption[]" under art. 44, but is instead an impermissible deviation from the art. 44 requirement of uniformity. As such, it violates art. 44 and must be declared unconstitutional for the reasons articulated in *Peterson I.* Based on that violation of art. 44, we therefore respond to the first reported question in the affirmative.[4]

b. *Is the unconstitutional exemption of § 413 severable from the January 1, 2002, effective date set by § 414?* For the reasons stated in the preceding section, § 413 must be struck as violative of art. 44. The plaintiffs contend that § 413 cannot be severed from § 414, and that we therefore must invalidate both sections. We disagree. General principles governing severability, including those codified by statute (see G. L. c. 4, § 6, Eleventh; G. L. c. 62, § 54), would indicate that the effective date set forth in § 414 can stand apart from the unconstitutional exemption of § 413. We also glean from the legislative history leading up to these provisions that the Legislature intended that the January 1, 2002, effective date be implemented in the event the May 1, 2002, date were invalidated. We therefore conclude that § 413 is severable from § 414.

"When a court is compelled to pass upon the constitutionality of a statute and is obliged to declare part of it unconstitutional, the court, as far as possible, will hold the remainder to be constitutional and valid, if the parts are capable of separation and are not so entwined that the Legislature could not have intended that the part otherwise valid should take effect without

---

[4]Because of our determination that § 413 violates art. 44, we need not reach the other components of the first reported question. We therefore express no opinion as to whether § 413 violates due process or equal protection guarantees.

the invalid part." *Boston Gas Co.* v. *Department of Pub. Utils.,* 387 Mass. 531, 540 (1982), quoting *Opinion of the Justices,* 330 Mass. 713, 726 (1953). See *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Commonwealth,* 414 Mass. 411, 420 (1993). See also *Del Duca* v. *Town Adm'r of Methuen,* 368 Mass. 1, 13 (1975). If, however, "the court is unable to know whether the Legislature would have enacted a particular bill without the unconstitutional provision, it will not sever the unconstitutional provision, but will strike the entire statute." *Murphy* v. *Commissioner of the Dep't of Indus. Accs.,* 418 Mass. 165, 169 (1994), quoting *Mayor of Boston* v. *Treasurer & Receiver Gen.,* 384 Mass. 718, 725 (1981).

As to all statutes in the Commonwealth, the Legislature has announced its own preference in favor of severability. "The provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof." G. L. c. 4, § 6, Eleventh. That same preference has been expressly stated with respect to the taxation of income under G. L. c. 62. "If any part, subdivision or section of this chapter shall be declared unconstitutional, the validity of its remaining provisions shall not be affected thereby." G. L. c. 62, § 54. Thus, the absence of a specific severability provision in St. 2004, c. 149, itself is of no consequence to our analysis. See *New York* v. *United States,* 505 U.S. 144, 186 (1992), quoting *Alaska Airlines, Inc.* v. *Brock,* 480 U.S. 678, 686 (1987) (absence of severability clause "does not raise a presumption against severability"). Rather, even without an express severability clause in the enactment itself, there is a "well-established judicial preference in favor of severability," as well as the Legislature's codification of that same general preference, which we must respect. *Murphy* v. *Commissioner of the Dep't of Indus. Accs., supra* at 169 n.3.

Here, the January 1, 2002, effective date set forth in § 414 can stand on its own without the exemption provided in § 413. Setting aside § 413, the remaining § 414 "is fully operative as a law," *Immigration & Naturalization Serv.* v. *Chadha,* 462 U.S. 919, 934 (1983), quoting *Champlin Ref. Co.* v. *Corporations Comm'n of Okla.,* 286 U.S. 210, 234 (1932), and has

"independent force," *Del Duca* v. *Town Adm'r of Methuen, supra* at 13. Cf. *Greater Boston Real Estate Bd.* v. *Boston,* 428 Mass. 797, 802, 803 (1999) (despite severability provision in ordinance, ordinance struck in entirety where valid provisions "too embedded within the invalid portions to stand independently" and severance would leave ordinance "rife with references to banned but undefined conduct"). Under § 414, the new capital gains tax rate set forth in the Act is, in a straightforward manner, made effective on the specific (and constitutionally permissible) date of January 1, 2002. Nothing in the operation of § 414, standing by itself, would provide a reason to deviate from the judicial and statutory preference in favor of severability.

The ultimate question on severability, however, is the intent of the Legislature. We must seek to ascertain whether the Legislature would "have enacted [the] particular bill without the unconstitutional provision," *Mayor of Boston* v. *Treasurer & Receiver Gen., supra* at 725, or whether, in the absence of the unconstitutional provision, the Legislature would have preferred that the bill have "no effect at all," *Massachusetts Wholesalers of Malt Beverages, Inc.* v. *Commonwealth, supra* at 420. See *Route One Liquors, Inc.* v. *Secretary of Admin. & Fin.,* 439 Mass. 111, 119 (2003); *Murphy* v. *Commissioner of the Dep't of Indus. Accs., supra* at 170-171.

Here, if we were to look at §§ 413 and 414 alone, the legislative intent would be difficult to discern. Enacted in response to *Peterson I,* the two sections tell us that the Legislature still preferred the May 1, 2002, effective date, but tell us nothing as to whether, if the "exemption" theory to support that May 1 date did not survive constitutional scrutiny, the Legislature would have preferred an effective date of January 1, 2002, as opposed to an effective date of January 1, 2003. The January 1, 2002, date set forth in § 414 is, in one sense, merely a token date, a necessary stepping stone to get to the May 1 date that the Legislature actually desired. Given that the § 413 "exemption" would have virtually eradicated the ostensible January 1, 2002, effective date of § 414, it is unclear from those two sections whether the Legislature would have intended to give that January 1, 2002, date actual effect.

However, we are not constrained to look at §§ 413 and 414 in isolation, but instead may consider the legislative history of the earlier Act that §§ 413 and 414 sought to amend. That history makes clear that the Legislature intended, at least initially, to give operative effect to the January 1, 2002, date. Viewed broadly, the whole purpose of the Act, as stated in its preamble, was to "provide forthwith enhanced [S]tate revenues to assist in addressing a serious fiscal crisis." St. 2002, c. 186, preamble. In light of that purpose and the "serious fiscal crisis" that prevailed at the time, it would be illogical to conclude that the Legislature would opt to postpone implementation of the new increased rate and forgo the corresponding increased revenues for an entire year.

Beyond that general expression of purpose, there is legislative history expressly signaling an intent to implement the new capital gains tax rate effective January 1, 2002. The House initially voted in favor of a January 1, 2002, effective date for the various changes in the treatment and taxation of capital gains, despite some concerns about imposing the new rate retroactively. 2002 House Doc. No. 5054, § 3L. The Senate, in outside sections to the 2003 general appropriations bill, similarly voted in favor of a January 1, 2002, effective date for comparable changes in the capital gains tax rate. 2002 Senate Doc. No. 2300, outside § 22 (K) and (S). During the Senate budget debate, an amendment seeking to postpone the effective date of those changes until January 1, 2003, was rejected. 2002 Senate J. 1556, 1557. Thus, at the time that the conference committee began consideration of the various bills, both the Senate and the House had approved the January 1, 2002, effective date, and the Senate had expressly rejected a proposal to defer the rate change until January 1, 2003. For reasons that are unclear on this record, the conference committee recommended the insertion of § 32 of the Act, making the effective date May 1, 2002.[5] St. 2002, c. 186, § 32. As is apparent from § 32, and later from § 413 in the wake of *Peterson I*, the Legislature ultimately

---

[5]According to the Legislature's own rules, "[m]atters on which there exists no disagreement between the branches shall not be disturbed by the committee of conference." Rule 11A of the Joint Rules of the Two Branches, Manual for the General Court 2001-2002, at 585.

preferred an effective date of May 1. However, it is now established that the May 1, 2002, effective date cannot stand, as either a formal effective date or as an effective date achieved by means of an "exemption." As between a January 1, 2002, or a January 1, 2003, effective date (the two permissible choices remaining), we know that both branches of the Legislature had voted in favor of a January 1, 2002, effective date. As best we can now discern, the Legislature would still approve — as it previously had approved — of a January 1, 2002, date in preference to postponing implementation of the rate change until January 1, 2003. Thus, the traditional indicia pointing in favor of severability are reinforced by legislative history signaling the Legislature's preference for the January 1, 2002, date set forth in § 414.

We recognize that the legislative history on which we rely dates from the spring and early summer of 2002, when making the new rate retroactive to January 1, 2002, posed less of a burden on taxpayers than it would today — it is one thing to change the tax rate prior to the time that income tax returns for that year have been prepared and filed, and another matter to impose a rate change retroactively long after the affected taxpayers have filed their returns. That the Legislature in 2002 approved a January 1, 2002, effective date does not establish conclusively that the Legislature would still intend that that same effective date be imposed for the first time some three years later. It is, of course, within the Legislature's power to amend the Act yet again, if it wishes, to set the effective date at January 1, 2003. The Legislature, but not this court, may decide that the current fiscal climate, the administrative difficulties of collection and enforcement, and the burden on taxpayers who must amend their 2002 State income tax returns and pay additional taxes now make it advisable to select a January 1, 2003, effective date instead of the January 1, 2002, effective date. We, however, are constrained to apply the standard principles of severability, as set forth in G. L. c. 4, § 6, Eleventh, and G. L. c. 62, § 54. On this record, we see no ground on which to deviate from the customary application of those principles. We therefore conclude that § 413 is severable from § 414, and answer the second reported question in the affirmative.

3. *Conclusion.* For the foregoing reasons, we answer "yes" to the first two reported questions, and find it unnecessary to answer the third reported question. The matter is remanded to the single justice for further proceedings consistent with these responses to the reported questions.

*So ordered.*